JAMES A. VAN HEEST AND MARGARET VAN HEEST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Van Heest v. Commissioner
Docket Nos. 7186-78, 12148-78.
United States Tax Court
T.C. Memo 1980-556; 1980 Tax Ct. Memo LEXIS 27; 41 T.C.M. (CCH) 560; T.C.M. (RIA) 80556; December 16, 1980
Thomas J. Van Heest, for the petitioners. Rogelio A. Villageliu, *28 for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in petitioners' Federal income tax: Taxable Year
Amount of Deficiency
1974
$ 575.23
1975
673.36
1976
342.00
The only issue is whether amounts paid to petitioner James A. Van Heest (James) by a hospital where he was a medical intern and resident constitute "fellowship grants" within the meaning of section 117(a)(1)(B), Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts were stipulated by the parties. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners filed their joint Federal income tax returns for their taxable years 1974, 1975, and 1976. They resided in Milwaukee, Wisconsin, at the time that their petition for taxable years 1974 and 1975 (docket no. 7186-78) was filed, and in Brookfield, Wisconsin, at the time their petition for taxable year 1976 (docket no. 12148-78) was filed. James received his medical degree (M.D.) in 1973. *29 From July 1973 through June 1974, James served as a medical intern at St. Joseph's Hospital (Hospital) in Milwaukee, Wisconsin. From July 1974 through July 1978, he served as a resident in general surgery at the Hospital. James and the Hospital entered into annual, written agreements covering the period he worked there. The agreements provided that he would receive a $ 25 annual allowance for the purchase of medical uniforms, 2 weeks paid vacation, Hospital-paid professional liability and hospitalization insurance, and annual "salary" which exceeded $ 300 per month. The salary was not based upon need, and a fixed amount was paid to each intern and resident who had attained a similar level of experience. The amounts increased annually based upon experience. Under the internship agreement, James' hours of duty were from 7:30 A.M. to 5:00 P.M. each day, plus night call as scheduled. Under the residency agreements, he was to be on duty as scheduled by the Chairman of the Surgery Department for approximately 70 hours per week. The agreements obligated the Hospital to provide a suitable environment for medical education and training programs for interns and residents which met *30 American Medical Association standards. They obligated James to perform satisfactorily and to the best of his ability the customary services of internship and residency, to conform to Hospital rules and regulations, and not to engage in any outside remunerative work. As an intern, James' duty was to assist the private physicians who composed the staff at the Hospital in caring for their patients. After seeing the patient in his office, a staff physician would usually admit the patent to the Hospital. The intern (James) would be assigned to the patient and informed of the admission. He would see the patent, take a medical history and perform a physical examination. He would diagnose the patient's illness and initiate a course of treatment without the staff physician's presence. Subsequently, however, the latter would verify the diagnosis and plan of care and would remain ultimately responsible for the patient throughout his convalescence. As a resident James also assisted staff physicians in treating their private patients. In addition to his duties as an intern, he would perform surgical procedures in the presence of a staff physician, who would have final authority over *31 the operation. He would make post-operative follow-up rounds of the patients assigned to him and note relevant changes on their charts outside the presence of the staff physician, who made his own rounds as well. He was also periodically assigned night call duty, which required that he be immediately accessible for emergencies and complications during evening hours. Similar procedures were followed for emergency surgery as were followed for routine surgery. That is, the emergency patient's staff physician would be contacted, would decide whether surgery was necessary, and would be present for whatever surgical procedures the resident performed. The duties required of a resident at the Hospital were determined by the Chairman of the Department in which the particular resident was training and were designed to further develop his individual clinical skill and judgment so as to enable him to practice medicine as a specialist in his chosen field. The residents were under no obligation to become employees of the Hospital upon completion of their residencies; they were free to relocate wherever they chose.The staff physicians did not contribute directly to the financial support *32 of the interns and residents, who were paid by the Hospital. The Hospital was not a teaching hospital; its primary purpose was to provide patient care. As an intern and as a resident, James was not a candidate for a degree. On their Federal income tax returns for the taxable years in issue petitioners treated the amounts James received from the Hospital as "fellowship grants" within the meaning of section 117 and hence excluded a portion of such amounts from gross income as follows: Taxable Year
Amounts Received From
Amounts Excluded
Hospital
From Gross Income
1974
$ 10,732.48
$ 3,600
1975
11,969.28
3,600
1976
13,351.20
1,800
Respondent determined that these amounts were compensation for services and thus did not qualify as fellowship grants. He accordingly disallowed the exclusions. OPINION
Section 117 provides: (a) GENERAL RULE.--In the case of an individual, gross income does not include- (1) any amount received-- (B) as a fellowship grant (b) LIMITATIONS.-- (2) INDIVIDUALS WHO ARE NOT CANDIDATES FOR DEGREES.--In the case of an individual who is not a candidate for a degree * * *, subsection (a) shall apply only if the *33 condition in * * * (A) is satisfied * * *. (A) CONDITIONS FOR EXCLUSION.--The grantor * * * is-- (i) an organization described in section 501(c)(3), which is exempt from tax under section 501(a), * * * or, (iv) the United States, or an instrumentality or agency thereof, or a State, * * * or any political subdivision thereof, or the District of Columbia. Thus, for any portion of a payment to be excludable from gross income, the payment must first qualify as a "fellowship grant." [2] The Code does not define the term, but the Treasury Regulations do, and their validity was upheld by the Supreme Court in Bingler v. Johnson,394 U.S. 741 (1969). These Regulations provide as follows: *34 Section 1.117-3. DEFINITIONS. (c) Fellowship Grants. A fellowship grant generally means an amount paid or allowed to * * * an individual to aid him in the pursuit of study or research. Section 1.117-4. ITEMS NOT CONSIDERED AS SCHOLARSHIPS OR FELLOWSHIP GRANTS. The following payments * * * shall not be considered to be amounts received as a * * * fellowship grant for the purpose of section 117: (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) * * * any amount paid * * * to * * * an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. The Supreme Court stated in Bingler v. Johnson,394 U.S. 741, 751, 757-758 (1969): [T]he definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no strings" educational grants, with no requirement of any substantial quidpro *35 quo from the recipients. The thrust of the provision * * * is that bargained-for payments, given only as a "quo" in return for the "quid" of services rendered--whether past, present, or future--should not be excludable from income as "scholarship" funds. It is clear that, under the preceding authorities, the amounts which the Hospital paid to James during his internship and residency were not fellowship grants because they were given for the substantial services which James performed both as an intern and as a resident. Petitioners argue that because the purpose of these programs was educational and because, to be effective, they had to require the intern and resident to "learn by doing," the stipends paid pursuant to such programs qualified as "fellowship grants." Suffice it to say that many fields of technical expertise can be mastered only through "practice," i.e., the supervised performance of the specialized tasks. Thus, one learns to become a welder by welding, a lawyer by writing briefs and arguing in court, and a licensed physician by treating patients. No one would argue that the industrial apprentice or first-year law associate should be able to exclude *36 any part of his wages from gross income, even though each is really still learning and has not acquired the virtuosity of his more practiced mentors. We do not see how their situation fundamentally differs from that of the medical trainee. The Regulation distinguishes between apprenticeship-type programs where one acquires expertise through rendering services (even though, at first, the services may not be of very great value) and grants for research and study which primarily benefit the grantee in his individual capacity.
Nor does it matter that, in the instant case, the services of the interns and residents mainly assisted the private staff physicians in caring for their patients. The fact is that the Hospital's purpose was to provide patient care; all of its personnel, whether technically on its payroll or not, were collectively engaged in this function. And it is clear that the interns and residents were expected to perform services forsomeone in return for their salaries. It does not matter that the person paying the salaries and the person for whom the servies were performed may not have been identical. See section 83. [3]
*37 Therefore, because the amounts which the Hospital paid to James represented compensation for services, they were not "fellowship grants" and hence were fully includible in petitioners' gross income for the taxable years in issue. To reflect the foregoing, Decisions will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Also, because James was not a candidate for a degree, the grantor of the fellowship must be an exempt organization or public agency. There is no evidence in the record to show that St. Joseph's Hospital was either. However, through the trial of this proceeding, petitioners were prose and did not have benefit of tax or other counsel. Negotiating the intricacies of the Internal Revenue Code with complete success is a challenge to the most experienced tax professionals and can often prove impossible for the layman. We therefore decline to hold against petitioner due to a mere technical deficiency in proof, as it appears that respondent simply forgot to offer to stipulate to the Hospital's exempt status. Indeed, respondent does not address the issue of brief. We prefer to base our decision on more substantive considerations.↩
3. In this connection it is interesting to note that, even had the staff physicians paid the interns and residents themselves, the economic substance would still be the same, because the physicians, rather than the Hospital, would simply pass the cost through to their patients. In other words, no matter which party pays the intern or resident directly, the ultimate cost is borne by the patient or his insurer, as it should be.↩